UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TAMKO BUILDING PRODUCTS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:10CV891 CDP |
| FACTUAL MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

Plaintiff TAMKO Building Products, Inc. is a manufacturer of roofing products.  In late 2008, TAMKO's supplier of asphalt flux was unable to supply it with an adequate amount of this product, and TAMKO was forced to shut down its Frederick, Maryland facility for approximately one month.  TAMKO held an insurance policy with defendant Factory Mutual Insurance Company, and it submitted a claim for the damages it allegedly suffered during the shutdown.

Factory Mutual refused to pay the claim, and invoked an appraisal provision seeking an appraisal of any damages.  TAMKO filed this suit seeking to recover under the policy and alleging vexatious refusal to pay.  Factory Mutual filed a counterclaim seeking a declaration of no coverage.

Based on the undisputed evidence before me, I conclude that the loss here is covered by the policy, and so TAMKO is entitled to summary judgment on the

coverage issue.  I also agree with TAMKO that the appraisal award is void and unenforceable.  I will grant Factory Mutual summary judgment on TAMKO's other claims, and so the only issue remaining for trial is the amount TAMKO is owed under the policy.

## <u>Background</u>

TAMKO is a manufacturer of roofing materials, including various types of asphalt shingles.  In order to produce those shingles, TAMKO purchases coating grade asphalt from its supplier Bitumar USA, Inc.  Bitumar produces the coating grade asphalt using a product called asphalt flux, which it purchases from Irving Oil, Ltd.  Irving operates an oil refinery in New Brunswick, Canada.  Its operations consist of a three-room monobuoy located in the Bay of Fundy, to which ships dock while unloading oil, and a pipeline system connecting the monobuoy to the onshore storage tanks.  Collectively, the monobuoy and subsea pipeline is referred to as a "single point mooring" (SPM) system.

In August 2008, Irving Oil shut down its pipeline because of damage to the pipeline and a subsequent oil leak.  Because of the shutdown, Bitumar was unable to obtain asphalt flux from Irving Oil, so TAMKO was unable to receive coating grade asphalt from Bitumar.  TAMKO therefore slowed and eventually stopped production completely on September 15, 2008, and it resumed operation on

October 12, 2008.  TAMKO alleges that the shut down caused a loss of approximately $12 million.

Factory Mutual issued Commercial Property Insurance Policy FM469 to TAMKO for the policy period from June 1, 2008 to June 1, 2009.  TAMKO submitted a claim for its loss to Factory Mutual in September 2008.  The parties exchanged information for approximately nine months before Factory Mutual decided that it would not cover TAMKO's claim.  They continued to negotiate and exchange documents, however, until May 2010, when TAMKO filed this suit.  In response, Factory Mutual demanded appraisal pursuant to the terms of the policy.

Factory Mutual chose Peter Hagen to serve as its appraiser, and TAMKO chose Ken Sorenson.  Those appraisers then selected Steve Rosenthal as the neutral umpire.  During the appraisal, TAMKO became suspicious that Hagen was not disinterested because of previous business interactions between Hagen and Factory Mutual.  The appraisal concluded with an award of $3,569,261.  Thereafter, TAMKO amended its complaint to add a fraud and suppression count related to the appraisal.  Factory Mutual filed a motion to dismiss the newly added counts, which I previously denied.  I also ordered Factory Mutual to produce discovery regarding any bias of its chosen appraiser.

TAMKO now moves for summary judgment, seeking a declaration that the policy provides coverage for its loss and that the appraisal was void and

unenforceable because Hagen and Rosenthal were not disinterested.  Factory

Mutual seeks summary judgment on TAMKO's second amended complaint and

seeks to enforce the appraisal award.  The parties also filed several motions to

exclude or limit expert testimony.

## Discussion

In determining whether summary judgment should issue, I must view the

facts and inferences from the facts in the light most favorable to the nonmoving

party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).  The moving party has the burden to establish both the absence of a

genuine issue of material fact, and that it is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986);

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Once the moving party has

met this burden, the nonmoving party may not rest on the allegations in its

pleadings but by affidavit or other evidence must set forth specific facts showing

that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e).

Under Missouri law, which applies to this diversity case, the rules governing

the interpretation of insurance polices are well settled.  *Columbia Mut. Ins. Co. v.

Schauf*, 967 S.W.2d 74, 77 (Mo. 1998) (en banc).  A court must apply the general

rules of contract construction when interpreting an insurance policy, because

insurance policies are contracts.  *Todd v. Missouri United Sch. Ins. Council*, 223

- 4 -

S.W.3d 156, 160 (Mo. 2007) (en banc).  A court must give the contract's terms their plain and ordinary meaning, unless a term is ambiguous.  *Farmland Indus., Inc. v. Republic Ins. Co.*, 941 S.W.2d 505, 508 (Mo. 1997) (en banc).  A term's plain and ordinary meaning is the meaning that an average layperson would give the term.  *Farmland Indus., Inc.*, 941 S.W.2d at 508.  In addition, a court "should not interpret policy provisions in isolation but rather evaluate policies as a whole."  *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. 2009).  Finally, in interpreting an insurance contract, the court must "endeavor to give each provision a reasonable meaning and to avoid an interpretation that renders some provisions useless or redundant."  *Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 556 (Mo. Ct. App. 2008).

A term is ambiguous only if the terms are "reasonably and fairly open to different constructions, and there is duplicity, indistinctness, or uncertainty of meaning."  *Miller's Classified Ins. Co. v. French*, 295 S.W.3d 524, 526 (Mo. Ct. App. 2009) (citations and internal quotation marks omitted).  When an ambiguity exists in an insurance policy, the court must interpret the policy in favor of the insured.  *Todd*, 223 S.W.3d at 160.  If, however, the policy is unambiguous, the court must enforce the contract's terms as written.  *Id.*

<u>Coverage Under the Policy</u>

Generally, to establish a prima facie case of coverage under an insurance policy under Missouri law, the insured must demonstrate: (1) "issuance and delivery of the insurance policy," (2) "payment of the premium," (3) "a loss caused by a peril insured against," and (4) "notice of loss and proof of the loss given to the insurer as the policy requires." *Nixon v. Life Investors Ins. Co. of America*, 675 S.W.2d 676, 679 (Mo. Ct. App. 1984). The element at issue in this case is whether the loss was caused by a peril against which TAMKO was insured – specifically whether it occurred at a location insured under the policy.

The insurance policy in this case provides "dependent time element" coverage, which it describes as follows: "This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at Dependent Time Element Locations located within the TERRITORY of this Policy." The policy then defines a "dependent time element location" as:

(i)    Any Location:

    (a)    of a direct customer, supplier, contract manufacturer or contract service provider to the Insured.

    (b)    of any company under a royalty, licensing fee or commission agreement with the Insured.

(ii)     Any Location of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a Location described in a)(i) above.

In the policy's Declarations, it more broadly defines an "Insured Location" under the policy as follows:

A.     The coverages under this Policy apply to an Insured Location unless otherwise provided.

Insured Location is a location:

1)     listed on a Schedule of Locations, Appendix A attached to this Policy.

2)     covered as a Miscellaneous Unnamed Location.

3)     covered under the terms and conditions of the Automatic Coverage or Errors and Omissions provisions.

B.     References and Application.  The following term(s) wherever used in this Policy means:

1)     Miscellaneous Unnamed Location: A Location owned, leased or rented by the Insured but not specified in the Schedule of Locations.

2)     Location:

a)     as specified in the Schedule of Locations, or

b)     if not specified in the Schedule of Locations, a Location is a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing) bounded on all sides by public streets, clear land space or open waterways, each not less than fifty feet wide. Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this Reference and Application.

The only location specified in the Schedule of Locations in the policy relevant to this analysis is TAMKO's facility in Frederick, Maryland.

The parties' arguments regarding coverage under the policy for TAMKO's loss center around the policy's "dependent time element" (DTE) coverage, and whether the damage to Irving Oil's pipeline occurred at a covered DTE location. TAMKO argues that the single point mooring system is part of one integrated oil system – all other parts of which Factory Mutual admits constitute covered DTE locations – and that even if it is not considered to be part of the system, it is an independently covered DTE location under the terms of the policy. Factory Mutual argues that the SPM system is not covered under the explicit terms of the policy, regardless of whether it is connected to other DTE locations. I agree with TAMKO that the SPM system is a covered DTE location under the policy, and so this is a loss covered by the insurance policy.

The parties agree that under the terms of the policy, Irving Oil is a supplier to TAMKO, such that any of its "locations" suffering physical loss or damage are covered under the policy. The policy defines a "location" as a "building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing)." These terms are not separately defined in the policy, however. "[W]hen words or phrases are not defined in the policy, [courts] look to the plain meaning of words or phrases as it would have been understood by an ordinary person of average intelligence when

- 8 -

buying the policy." *Long v. Shelter Ins. Cos.*, 351 S.W.3d 692, 701 (Mo. Ct. App. 2011) (citing *Jones v. Mid-Century Ins. Co.*, 287 S.W.3d 687, 690 (Mo. 2009) (en banc)). "To determine the ordinary meaning of a term, courts will consult standard English language dictionaries." *Mansion Hills Condo. Ass'n v. Am. Family Mut. Ins. Co.*, 62 S.W.3d 633, 638 (Mo. Ct. App. 2001).

TAMKO argues that the SPM system fits within the ordinary meaning of the terms dock, wharf, and building. Merriam-Webster's Collegiate Dictionary defines a "dock" as "a place (as a wharf or platform) for the loading or unloading of materials." Merriam-Webster's Collegiate Dictionary 341 (10th ed. 2002); *see City of Jefferson City, Mo. v. Cingular Wireless, LLC*, 531 F.3d 595 (8th Cir. 2008) (approving the use of Merriam-Webster's Collegiate Dictionary to define Missouri statutory terms). It defines a "wharf" as "a structure built along or at an angle from the shore of navigable waters so that ships may lie alongside to receive and discharge cargo and passengers." Merriam-Webster's Collegiate Dictionary 1340 (10th ed. 2002). It also defines a "building" as "a [usually] roofed and walled structure built for permanent use (as for a dwelling)." Merriam-Webster's Collegiate Dictionary 150 (10th ed. 2002).

Using the plain meaning of these terms, I conclude that the monobuoy and pipeline system does fit within the policy's list of covered locations. The monobuoy constitutes a building in that it consists of walls and a roof, and workers

occupy this space for several hours at a time.  It also meets the definition of a wharf, as it was built to allow ships to dock alongside the buoy to unload oil.[1] Finally, it constitutes a dock because it is a place to discharge cargo.  In fact, that is its sole purpose and function.  Factory Mutual's argument that the "monobuoy" is not covered solely because that precise term is not contained in the list of locations is not a reasonable construction of the policy.[2]  Rather, the policy, when read as a whole, is broad and inclusive, providing coverage for all "locations" of the insured's suppliers and the suppliers' suppliers, even without listing those suppliers in the policy itself.  Such a broad and inclusive policy is not subject to such a narrow construction of a particular phrase, analyzed in isolation.  I conclude that the monobuoy itself is a covered location under the policy, such that TAMKO's loss from the damage to the pipeline is covered.

Furthermore, even if the SPM system was not an independently covered location under the policy, it is an inseparable part of the entire Irving Oil facility.

---

[1]Factory Mutual argues that the monobuoy differs from a wharf or pier because ships can be restrictively docked to those structures, which are built along a shore.  In contrast, the monobuoy is located away from the shore, allowing ships to swing around its circumference with the tide and the weather when they are docked to it.  I conclude that the monobuoy's essential characteristics and function qualify it as a covered location under the policy, regardless of this distinction, and so Factory Mutual's argument is without merit.

[2]Factory Mutual also argues that because the policy contains a closed list of covered locations, the canon of *expressio unius est exclusio alterius* applies so as to exclude all other locations.  *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).  However, this argument is not persuasive because I have concluded that the monobuoy does, in fact, fit within the definition of several locations in the closed list.

Factory Mutual concedes that the on-shore portion of Irving Oil's facility is a covered location under the policy, but argues that there is no coverage for the connected pipeline and monobuoy.  As TAMKO argues, however, there would be no purpose for the on-shore facility without the monobuoy and pipeline, as the only way ships can transport oil to the facility is by docking at the monobuoy and unloading from that point.  The damage at the supplier's facility caused TAMKO's entire facility to shut down.  Interpreting the policy to provide coverage for only one portion of an interconnected facility is not reasonable.  Therefore, I conclude that TAMKO is entitled to coverage under the policy for its loss.

TAMKO also addresses exclusions under the policy, including the exclusions for deterioration and contamination.  Under Missouri law, exclusionary clauses are strictly construed against the dafter, "who also bears the burden of showing that the exclusion applies."  *Wasson v. Shelter Mut. Ins. Co.*, 358 S.W.3d 113, 124 (Mo. Ct. App. 2011) (internal quotation marks and citation omitted). TAMKO has pointed out that there is no evidence in the record to support any of those exclusions, and so Factory Mutual has not met its burden of creating a genuine issue of material fact.  In its response, Factory Mutual does not present any evidence supporting the applicability of these exclusions.  Rather, it merely states that the jury "could determine" that the damage was caused by deterioration or contamination.  These conclusory assertions do not present a genuine issue of

material fact.  I will therefore grant TAMKO's motion for partial summary

judgment on the issue of coverage.

Appraisal Award

TAMKO filed a motion for partial summary judgment, requesting a

declaration that the appraisal award is void and unenforceable on the basis that

Factory Mutual's appraiser, as well as the umpire, were not disinterested as a

matter of law.  Factory Mutual has filed a separate motion to enforce the appraisal

award that the umpire and their appointed appraiser approved pursuant to the terms

of the policy.  Because I conclude that the appraiser chosen by Factory Mutual was

not disinterested as required by the policy and the law, I will grant TAMKO's

motion.

The insurance policy includes provisions requiring an appraisal in the event

of a dispute regarding the total amount of loss covered by the policy.  It provides

the following:

> If the Insured and the Company fail to agree on the amount of loss,
> each will, on the written demand of either, select a competent and
> disinterested appraiser after:
>
> 1)    the Insured has fully complied with all provisions of this
>       Policy, including REQUIREMENTS IN CASE OF LOSS; and
>
> 2)    the Company has received a signed and sworn proof of loss
>       from the Insured.
>
> Each will notify the other of the appraiser selected within 20 days of
> each demand.

- 12 -

The appraisers will first select a competent and disinterested umpire. The appraisers have 15 days to agree on an umpire. After that time, either the Insured or the Company may request that an umpire will be selected by a judge. The judge must be a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss. Each appraiser will state separately the Actual Cash Value and replacement cost value. Those values will be as of the date of loss and the amount of loss, for each item of physical loss or damage.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1)      pay its chosen appraiser; and

2)      bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

Factory Mutual first contends that TAMKO waived its right to object to its selected appraiser, Peter Hagen, by its failure to file a formal objection letter at the time that Hagen was appointed. Factory Mutual also argues that TAMKO should be estopped from challenging Hagen now because it permitted the appraisal to continue despite its alleged concerns about Hagen's bias. Under Missouri law, waiver is "the intentional relinquishment of a known right." *Shahan v. Shahan*,

988 S.W.2d 529, 534 (Mo. 1999).  "If waiver is implied from conduct, the conduct

must clearly and unequivocally show a purpose to relinquish the right."  *Smith v.*

*Progressive Cas. Ins. Co.*, 61 S.W.3d 280, 284 (Mo. Ct. App. 2001) (internal

quotation marks and citation omitted).  Estoppel, which is a highly disfavored

equitable remedy by Missouri courts, arises "from the unfairness of permitting a

party to belatedly assert rights if he knew of those rights but took no steps to

enforce them until the other party has, in good faith, become disadvantaged by

changed conditions."  *Stenger v. Great S. Sav. & Loan Ass'n*, 677 S.W.2d 376, 383

(Mo. Ct. App. 1984).

　　　Though TAMKO did not file a formal objection letter to Hagen's

appointment until eight months after his appointment, TAMKO's behavior does

not rise to the level of waiver or demonstrate that it is estopped from asserting this

argument.  TAMKO's general counsel expressed concerns to Factory Mutual about

Hagen before his appointment in June 2010, which was a reiteration of a previous

formal objection letter that TAMKO sent to Factory Mutual regarding a separate

appraisal between these parties.  Factory Mutual never responded or took any

action until that case was resolved by settlement.  TAMKO sought discovery

concerning Hagen's relationship with Factory Mutual numerous times before its

formal objection letter.  TAMKO also brought the issue of Hagen's

disinterestedness to this court, demonstrating that it was actively pursuing its

concerns and seeking discovery.  Though Factory Mutual convinced me at that time to enter a stay of discovery on this issue until after the appraisal was completed, my ruling was not intended to prevent TAMKO from ever pursuing its claim of bias.  Furthermore, after TAMKO filed its formal objection letter in February 2011 and after the appraisal was completed in April 2011, Factory Mutual did not comply with TAMKO's discovery requests until after my order of October 12, 2011, compelling it to produce such information.

These actions by TAMKO do not demonstrate that it "clearly and unequivocally" relinquished its "known right" to object to Hagen's appointment as an appraiser.  Failure to file a formal objection letter does not forever preclude TAMKO from challenging Hagen's appointment, given TAMKO's continued efforts to gather information about Hagen's suspected bias.  Furthermore, it would not be equitable to hold that TAMKO is estopped from raising this claim, given Factory Mutual's own attempts to conceal this information in the discovery process.  Therefore, I will consider TAMKO's motion for summary judgment regarding the appraisal award on its merits.

Under Missouri law, when an insurance policy provides that the parties will determine the amount of loss by conducting an appraisal, the individuals selected to act as appraisers – including the individual selected to serve as the umpire – must not be interested, biased, or prejudiced.  *See Orr v. Farmers Mut. Hail Ins.*

*Co. of Mo.*, 201 S.W.2d 952, 957 (Mo. 1947).  An appraiser may be considered interested in a number of ways, such as being "frequently or habitually employed by insurers as an appraiser and . . . by his conduct [making] it clear that he understands that he is acting in their interests."  *Id.*  An appraiser may also become biased by having a financial interest in the outcome of the appraisal, even if indirectly.  *See Schwartzman v. London & Lancashire Fire Ins. Co., Ltd., of Liverpool, Eng.*, 2 S.W.2d 593, 594-95 (Mo. 1927).  This is a strict standard, as the Missouri Supreme Court has stated: "The fairness and impartiality of an appraiser should be, like that of a juror, not only above reproach, but above suspicion."  *Orr*, 201 S.W.2d at 957.  Courts applying this law have vacated appraisal awards involving an interested appraiser, declaring them void and unenforceable.  *See Harris v. Am. Modern Home Ins. Co.*, 571 F. Supp. 2d 1066, 1079 (E.D. Mo. 2008); *Orr*, 201 S.W.2d at 957; *Schwartzman*, 2 S.W.2d at 594-95.  Moreover, in this case, the insurance contract itself specifies that the appraisers be disinterested.

I conclude that the appraiser appointed by Factory Mutual, Hagen, was interested as a matter of law.  Though Hagen has provided an affidavit disputing this, the undisputed facts of Hagen's conduct – as opposed to his self-serving statements in the affidavit – demonstrate that he was biased.  It is undisputed that Hagen sought advice from Factory Mutual on whom he should select as an

umpire;[3] submitted his draft presentation for the appraisal hearing to Factory

Mutual, after which Factory Mutual performed edits on that document; and sought

approval on whether he should agree to the amount calculated by Rosenthal.  The

combined effect of these communications demonstrate that Hagen was not acting

as a fair and disinterested appraiser.

Furthermore, even without considering Hagen's actual conduct during the

appraisal, his prior business dealings with Factory Mutual render him interested

because of an indirect financial interest in the outcome of the appraisal.  In

*Schwartzman*, the Missouri Supreme Court vacated an appraisal award involving

an umpire who was an officer and stockholder of a company that had other

employees working for the insurance company involved in the appraisal.  The

court provided the following explanation:

> As a stockholder of the Bell Investment Company he was entitled to
> receive dividends which necessarily included earnings of the business
> brought to it by the Firemen's Insurance Company.  He thus became
> interested, indirectly though it may be, as agent of the insurance
> company involved in the appraisal, and consequently disqualified and
> incompetent to act as umpire.

---

[3]This fact alone may not be enough to determine that Hagen was interested.  In *Phoenix Assur. Co. of N.Y. v. Singer*, 221 F. Supp. 890, 894 (E.D. Mo. 1963), the court held that an appraiser was not interested by virtue of his consultation with the insured concerning the selection of an umpire.  But the communication in this case appears to be much more extensive than that present in *Singer*.  In one particular instance, Hagen emailed a Factory Mutual employee regarding potential umpires, and when Factory Mutual suggested another individual, Hagen replied: "I think [Sorenson] might bite, I'll present it as my idea, not yours!"  (Doc. #128-18, at 1).

> Even though the evidence tends to establish that no actual bias,
> prejudice, influence, or fraud was disclosed on the part of the umpire,
> yet public policy and an unconscious predilection to favor one's
> interest renders an arbitrator, directly or indirectly interested in the
> result of the arbitration, partial, incompetent, and disqualified.

*Schwartzman*, 2 S.W.2d at 594.

Here, it is undisputed that Hagen had personally worked on at least twenty-six matters for Factory Mutual.  He has a nine-percent ownership interest in his accounting firm, and work conducted for Factory Mutual constitutes between four and seven percent of his firm's total annual business.  He also had outstanding accounts with Factory Mutual at the time of this appraisal totaling over $940,000, and Hagen personally cultivated his firm's business relationship with Factory Mutual by hosting lunches, dinners, sporting events, and office visits, among other things.  These figures demonstrate that Hagen had a financial interest in the outcome of the appraisal because even though he did not collect a contingency fee, his ongoing and future business prospects with this long-term client rendered him interested in the outcome of this appraisal.

Because Hagen is interested as a matter of law, I need not reach TAMKO's allegations concerning Rosenthal's relationship with Factory Mutual.  I will grant TAMKO's motion for partial summary judgment that the appraisal award is void and unenforceable.  Accordingly, I will also deny Factory Mutual's renewed motion to enforce the appraisal award.

<u>Vexatious Refusal to Pay</u>

Factory Mutual also seeks summary judgment on TAMKO's claim for vexatious refusal to pay under § 375.420 of the Missouri Revised Statutes.  To establish a claim for vexatious refusal to pay, TAMKO must prove: (1) it had an insurance policy with Factory Mutual; (2) Factory Mutual refused to pay; and (3) Factory Mutual's refusal was without reasonable cause or excuse.  *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 457 (Mo. 2006).  It is undisputed that TAMKO had an insurance policy with Factory Mutual, and that Factory Mutual refused to pay TAMKO's claim for its loss in this case.  The only issue is whether Factory Mutual's refusal to pay was without reasonable cause or excuse.

Factory Mutual argues that because the question of coverage in this case constituted a genuine litigable issue, it cannot be deemed to have vexatiously refused to pay the questionable claim.  *See Macheca Transp. v. Phila. Indem. Ins. Co.*, 649 F.3d 661, 674 (8th Cir. 2011) ("There is no vexatious refusal when the insurer has reasonable cause to believe and does believe there is no liability under its policy and that it has a meritorious defense.").  A litigable issue may exist "[w]hen no Missouri case directly addresses a coverage issue," and "an insurer may insist upon a judicial determination of open questions of law or fact without being penalized." *Id.*  (citations omitted).  Under Missouri law, however, "[t]he existence of a litigable issue, either factual or legal, does not preclude a vexatious

penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." *DeWitt*, 667 S.W.2d at 710.

In this case, there was an open question of law as to whether the monobuoy could be considered a covered location under the terms of the policy. There is no case law addresing this precise coverage issue. Under these circumstances, Factory Mutual's failure to pay the claim outright and instead seek judicial determination of its liability was not vexatious as a matter of law. I will therefore grant Factory Mutual's motion for summary judgment on TAMKO's vexatious refusal to pay claim.

Fraud and Suppression

Factory Mutual seeks summary judgment on the fraud and suppression claim raised by TAMKO in its second amended complaint. That count arises out of Factory Mutual's alleged fraud and suppression in relation to the appraisal proceeding and its relationship with Hagen and Rosenthal.

The elements of a fraudulent misrepresentation claim under Missouri law are:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury.

*Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 132-32 (Mo. 2010) (en banc).  "A plaintiff's failure to establish any one of the essential elements of fraud is fatal to recovery."  *Id.* at 132.

In this case, TAMKO did not rely on any misrepresentation by Factory Mutual.  "The test of whether a plaintiff relied upon a misrepresentation is simply whether the representation was a material factor influencing final action."  *Stein v. Novus Equities Co.*, 284 S.W.3d 597, 603 (Mo. Ct. App. 2009) (internal quotation marks and citation omitted).  According to TAMKO, the "final action" that Factory Mutual induced was TAMKO's participation in the appraisal process.  It is undisputed that Factory Mutual invoked the appraisal provision of the insurance policy in this case, and that TAMKO initially complied with that proceeding pursuant to its contractual obligation to do so.  Additionally, TAMKO continued with the appraisal while trying to obtain discovery into Hagen's relationship with Hagen, which included its participation in the appraisal even after I issued a stay of discovery into Hagen's alleged bias.  Based on these facts, TAMKO did not rely on any misrepresentation of Hagen's disinterestedness as the basis for its participation in the appraisal, but rather acted on its contractual and court-imposed obligations to do so.

Furthermore, it is also undisputed that TAMKO voiced concerns about Hagen's disinterestedness throughout the appraisal process, even before filing an

official objection letter.  TAMKO cannot claim that it had no knowledge of Hagen's bias when it continued to voice concerns and seek more information about Hagen's relationship with Factory Mutual.  It could not have reasonably relied on any misrepresentation given its continued concerns.  Therefore, TAMKO's claim of fraud is unsupported by the facts in this case.

In a claim of suppression, "[c]oncealment of a material fact can serve as a substitute for the elements of a false representation if there exists a duty to disclose."  *White v. Bowman*, 304 S.W.3d 141, 149 (Mo. Ct. App. 2009).  However, even though a "party's failure to disclose the information serves as a substitute for the false representation element required" in a general fraud claim, "the plaintiff still has the burden of proving every other element of fraud."  *Brown v. Mickelson*, 220 S.W.3d 442, 451 (Mo. Ct. App. 2007) (internal quotation marks and citations omitted).  Because TAMKO has not produced facts demonstrating that it was ignorant of or that it relied on any facts concealed by Factory Mutual, its suppression claim fails for the same reason as its fraud claim.  Therefore, I will grant Factory Mutual's motion for summary judgment as to the fraud and suppression claims in TAMKO's second amended complaint.

## Expert Witnesses

TAMKO and Factory Mutual have each filed a motion to exclude testimony from expert witnesses analyzing the damages in this case.  Factory Mutual seeks to

exclude John Kopfer, on the grounds that he failed to conduct an investigation or set forth a proper basis for selecting his loss calculation methodology and that he ignored critical facts in reaching his final opinion.  TAMKO seeks to exclude Anirban Basu and David Elmore because their opinions lack foundation and are merely speculative, and because their testimony would constitute an impermissible credibility attack on TAMKO's own expert witness.  I believe that the testimony of each of these experts will help the jury determine the primary issue in the case.  I also find that each expert has formed his opinion using sufficient facts applied reliably to solid principles and methods.  I will therefore deny both motions to exclude.[4]

An expert who is qualified by "knowledge, skill, experience, training, or education" may provide testimony that bears on "scientific, technical, or other specialized knowledge" if that testimony will help the trier of fact understand the evidence or determine a disputed fact and if "(1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the

---

[4]The parties filed several other motions to exclude expert witnesses, which I will grant because the testimony of those witnesses is no longer relevant in light of my summary judgment rulings.  Specifically, I will grant the motions to exclude the testimony of TAMKO's monobuoy expert, David Collard, and the testimony of Factory Mutual's two coverage experts, Alfred Cipriani and Captain Christopher Karentz.  I will also exclude the testimony of Donald Dinsmore, TAMKO's expert designated to testify about the appraisal and about insurance company practices.

facts of the case."  Fed. R. Evid. 702.  This rule imposes a gatekeeping

responsibility on the district court to consider the reliability of the evidence before

determining that it is admissible.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

579, 589 (1993).

When assessing the reliability of expert testimony, a trial court should

consider several factors, including: "(1) whether the concept has been tested, (2)

whether the concept has been subject to peer review, (3) what the known rate of

error is, and (4) whether the concept is generally accepted by the community."

*Miller v. Baker Implement Co.*, 439 F.3d 407, 412 (8th Cir. 2006) (citing *Daubert*,

509 U.S. at 593-95).  For non-scientific expert testimony, such as the accounting

and damages principles used in this case, its reliability may more precisely be

evaluated "by reference to other standard principles attendant to the particular area

of expertise."  Fed. R. Evid. 702 advisory committee's note.

> As a general rule, the factual basis of an expert opinion goes to the
> credibility of the testimony, not the admissibility, and it is up to the
> opposing party to examine the factual basis for the opinion in cross-
> examination.  Only if the expert's opinion is so fundamentally
> unsupported that it can offer no assistance to the jury must such
> testimony be excluded.

*Bonner v. ISP Techs.*, Inc. 259 F.3d 924, 929-30 (8th Cir. 2001) (internal citation

omitted).

Factory Mutual explains that it is not objecting to the methodology used by

Kopfer or the documents on which he based his calculations, but rather his basis

for selecting that methodology and his failure to consider certain facts when

conducting his analysis.  Specifically, Factory Mutual contends that Kopfer did not

conduct a proper investigation into whether TAMKO was actually operating in

IMS when it suffered this loss.  Factory Mutual also argues that he failed to

consider relevant information about TAMKO's production capacity, sales history,

and inventory, and because of his failure to consider these factors, he did not have

a proper basis for choosing this loss calculation methodology.  TAMKO disputes

all of these allegations, either by offering facts in contrast to Factory Mutual's

assertions or by explaining exactly how Kopfer reached his decision and what he

did, in fact, consider in doing so.

Because Factory Mutual does not oppose the actual methodology chosen by

Kopfer or the documents he used to calculate his loss using that methodology, I

find that Factory Mutual has not produced a sufficient basis for excluding Kopfer's

expert testimony.  He is qualified to testify about these accounting principles, and

Factory Mutual may raise its challenges to the underlying factual basis for his

damages calculation at trial.  This is a case where "[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof"

will be the best way to attack this evidence.  *Daubert*, 509 U.S. at 596.  I will

therefore deny Factory Mutual's motion to exclude the expert report and testimony

of John Kopfer.

TAMKO filed its own motion to exclude the expert testimony of Anirban Basu and David Elmore.  It argues that the testimony of these experts is inadmissible because neither came up with his own damages calculation, but rather each expert's testimony would merely critique the methodology used and assumptions made by Kopfer.  Impeachment of an expert witness through contradictory testimony by another qualified expert is permitted under the federal rules of evidence, and it actually supports admissibility of the original expert's opinion because it presents a proper question of credibility for the jury.  *See, e.g.*, *EFCO Corp. v. Symons Corp.*, 219 F.3d 734,739 (8th Cir. 2000) (holding that the district court did not abuse its discretion in allowing plaintiff's expert witness to testify when it also allowed defendant's expert witness, who "disputed the methodology used by [plaintiff's expert]," to testify).  The testimony of Basu and Elmore may be helpful to the jury in evaluating the credibility of TAMKO's damages expert, and each has a reliable basis for his testimony.  I will therefore deny TAMKO's motion to exclude the expert testimony of Anirban Basu and David Elmore.

## Motion to Compel

Factory Mutual seeks to compel TAMKO to produce "all items that support TAMKO's decision to enter IMS" (Inventory Management System), which refers to a period of time in which the company's demand exceeds its production, so it

sells everything that it produces.  Specifically, Factory Mutual lists four categories of documents: (1) sales forecasts, (2) sales reports, (3) records of discussions between various TAMKO employees regarding the decision to enter IMS, and (4) spreadsheets, notes, reports, and other documents created when TAMKO decided to enter IMS.  Factory Mutual also refers to an "IMS Manual," of which it claims to have only received part because TAMKO has not certified that it is a complete and accurate copy.  Additionally, Factory Mutual seeks discovery of an organizational chart of TAMKO's entities.

Federal Rule of Civil Procedure 26(b)(1) sets forth the scope of discovery for actions filed in federal court:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense – including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Rule 26(b)(2)(C), however, requires the court to curtail the discovery of admittedly relevant evidence if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

As to the IMS Manual, numerous witnesses for TAMKO testified in deposition that the company does not maintain an official manual for IMS. Instead, the company has produced printouts from an internal website that is used to manage and track data when the company operates in IMS.  Factory Mutual mentions types of reports that are generated in the internal system during IMS and requests copies of those documents.  However, TAMKO's counsel explains that those reports are dynamic tools used in the system that can only be created while operating in IMS, and so it appears that TAMKO cannot reproduce these documents.  Because the IMS documents that Factory Mutual requests do not exist in discoverable form, I will deny any further discovery into this issue.

Regarding the sales reports and sales forecasts, Factory Mutual concedes that TAMKO has already presented an enormous amount of sales data. Furthermore, TAMKO presented sworn testimony from TAMKO's designated representative, Titia Miller, explaining that the factors used to determine whether to enter IMS are the current backlog of orders and the amount of time it would take to fulfill that backlog based upon the production capacity.  Therefore, sales reports

and sales forecasts are not used in the decision to enter IMS, and so I will not order TAMKO to produce any additional sales data because it is not relevant.

Additionally, Factory Mutual requested records of discussions – including spreadsheets, notes, and other reports – from meetings between TAMKO representatives in determining whether to enter, and on a continuing basis whether to stay operating in, IMS.  Though one TAMKO witness testified that spreadsheets were created from these meetings, its corporate representative and TAMKO's counsel assert that no formal documents were created.  At most, there may have been emails from these communications.  However, I do not find that the relevance of these documents outweighs the burden of trying to locate these emails, given the other IMS documents available to Factory Mutual.

Finally, Factory Mutual seeks an organizational chart of TAMKO's entities that was referenced in a deposition of TAMKO's corporate controller, Jeff Hauck. TAMKO's counsel asserts in his motion that no such chart exists, though it has provided a list to Factory Mutual of all of the companies TAMKO owns in part or in whole.  Because it does not appear that Factory Mutual needs a formal chart for purposes of this litigation – if it even exists – in light of the list of entities that TAMKO provided to it, I will deny the request.  Therefore, I will deny in whole Factory Mutual's motion to compel and motion for sanctions.

**Conclusion**

To summarize, TAMKO is entitled to summary judgment on its claim of coverage and on Factory Mutual's counterclaim seeking a declaration of no coverage.  Factory Mutual is entitled to summary judgment on TAMKO's claims of vexatious refusal to pay, fraud and suppression.  I will not enforce the appraisal award because the interest of the appraiser renders the award void and unenforceable.  I will deny both parties' motions to exclude one another's damages experts, but I will grant the motions to exclude the other experts because those experts no longer have any relevant or helpful testimony.  Finally, I will deny Factory Mutual's motion to compel and for sanctions.

The jury trial of this matter remains set on the two-week docket beginning on September 24, 2012.

Accordingly,

**IT IS HEREBY ORDERED** that TAMKO's motion for partial summary judgment on the issue of coverage [#118] and its motion for partial summary judgment that the appraisal award is void and unenforceable [#125] are GRANTED.

**IT IS FURTHER ORDERED** that Factory Mutual's motion for summary judgment [#127] is GRANTED only as to the claims for vexatious refusal to pay and fraud and suppression and is DENIED in all other respects.

- 30 -

**IT IS FURTHER ORDERED** that Factory Mutual's renewed motion to enforce the appraisal award [#129] is DENIED.

**IT IS FURTHER ORDERED** that Factory Mutual's motion to exclude the expert testimony of John Kopfer [#117] and TAMKO's motion to exclude the expert testimony of Anirban Basu and David Elmore [#119] are DENIED.

**IT IS FURTHER ORDERED** that Factory Mutual's motion to exclude the expert testimony of David Collard [#106] and Donald Dinsmore [#116] are GRANTED, and TAMKO's motion to exclude the expert testimony of Alfred Cipriani and Captain Christopher Karentz [#123] is GRANTED.

**IT IS FURTHER ORDERED** that Factory Mutual's motion to compel and motion for sanctions [#97] is DENIED.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of August, 2012.

- 31 -